JOSEPH RATZER and others

*v.*

JOHN RATZER, senior, and others.

1. A partnership decreed to have existed between three brothers, all past their majority, in a business carried on by them in the name of R. Brothers, but claimed by their father and one of the brothers to have been, notwithstanding the firm name, the business of the father alone. The father and the last mentioned brother insisted that the complainants worked for their father in the business, in consideration of their support and pocket money alone, and under a sort of family arrangement.

2. In the absence of any agreement as to the interests of the partners, a partnership is presumed to have been carried on for the joint interest of the partners, and each is entitled to an equal share of the profits with the others. So, too, the fact that the business is carried on in the names of the persons by whom it is conducted, raises the presumption that it is their business.

Bill for relief. On final hearing on pleadings and proofs.

Ratzer v. Ratzer.

*Mr. C. B. Harvey* and *Mr. R. Gilchrist,* for complainants.

*Mr. J. B. Vredenburgh,* for defendants.

The Chancellor.

The bill is filed by Joseph Ratzer and John Ratzer, junior, against their father and mother and their brother Felix.    It prays a dissolution of an alleged co-partnership between the complainants and their brother, in the business of teaming, and selling brewers' grains, and in quarrying, and an account from their father and mother for moneys alleged to have been received by them in trust from the earnings of the complainants and the proceeds of the business.    The testimony, which consists mainly of the depositions of the parties, is extremely voluminous.    I do not deem it necessary, however, to refer to its details at any great length.

It appears that the complainant, Joseph Ratzer, from the time he attained his majority (in or about 1860) up to November, 1865, labored as a mechanic, at good wages, away from his father's house, and delivered over to his mother, from time to time, to be kept for him, the surplus of his earnings over the amount expended by him for his maintenance, and a small amount of pocket money; that at the last mentioned date he proposed to go to Delaware, but was urged by his parents to stay in Paterson, where they lived, and work at the business of carting, which, on their persuasion, he consented to do, and, having procured the necessary horses, wagons and harness, he entered upon the business.    In 1866, his brother Felix, who had come to New Jersey from Chicago, joined him in the business, and in May, 1867, their brother John, who then lived with his father, entered into it with them.    The association of the three brothers in the business continued until the 9th of August, 1874, when a rupture and dissolution of the association occurred through the refusal of Felix and the parents to come to any settlement with the complainants in respect

to the property which had been acquired in the business. A large part of the moneys received from the business was delivered over to the mother, who deposited it in the savings bank; sometimes in her own name, and sometimes in that of her husband. With the money so deposited, real estate was purchased, the title to which was taken in the name of the father, and other investments were made in his name. With part of the money, some land was bought in the name of Felix. The defendants allege that the business in which the sons were so engaged, from 1865 to 1874 was, with the exception of one or two years, when it was, as they allege, carried on by the father and Felix, the business of the father alone. That Joseph delivered over to his mother his surplus earnings while he worked on his own account as a mechanic, is not denied, but it is denied that they were, in the aggregate, of so large amount as he claims ($1,200 to $1,400), and it is alleged that he, from time to time, received from her so much of the money as he called for. Not only is the trust, as to this money, absolutely denied, but the mother claims that it was bestowed upon her as a gift. It is not denied that the profits of the business carried on by the three brothers, up to August, 1874, went into the hands of their father and mother, except $1,000, said to have been paid to Felix, on the dissolution of the alleged partnership between him and his father, and so much as, after the rupture, John Ratzer, junior, collected and did not account for, and the amount received by each of the sons, for support and pocket money. In 1866, the father was accidentally introduced to a very ·profitable business, buying "grains" from the brewers, and retailing them to the farmers for feed for cows. After conducting it for a very short time as agent for the person (a Mr. Wiggers) through whom he became acquainted with it, and who obtained the grains from the breweries, he made arrangements to obtain them himself, and thenceforward the entire business was carried on in the name of J. & F. Ratzer, until 1868, from which time, until August 9th,

1874, it was conducted in the name of Ratzer Brothers. In 1870, a farm of forty-two and one-half acres, at Preakness, in Passaic county, was bought with the profits of the business, and the title taken by the father. Soon afterwards, the three sons added to their business that of quarrying, which they conducted on that land, under the same firm name of Ratzer Brothers. All the proceeds of this business, over the expenses, were handed over to, and retained by, their father and mother. That the three sons worked together from the beginning of their association to August 9th, 1874, is admitted. That the complainants received out of the business but little more than their support, is not denied. That the business of buying and selling grains was exceedingly profitable, and that the father and mother received, with the exceptions before mentioned, all the profits, and still hold them, and refuse to account to the complainants for any part of them, is also admitted. The defendants insist, as before stated, that the business, from the beginning, with the exception of the period covered by the alleged partnership between the father and Felix, belonged wholly to the father, and that the sons worked in it for him as workmen merely, without compensation, except support and pocket money. There is no proof that any agreement or understanding existed that the sons, who were past their majority, were to give to their parents their earnings, and their profits of the business, or any part of them. Indeed, the evidence is to the contrary. Not only do the complainants swear that there was no such agreement, and that their earnings and their shares of the profits of the business were to be accounted for to them, but it appears that the rupture between the parties was occasioned by the demand of the complainants for their shares of the profits and their earnings. Besides, it appears satisfactorily that the mother admitted the trust on which the money was held, for she was solicitous to keep some of her purchases from Joseph's knowledge, because, as she said, he

would not approve of the expenditure, and, as she expressed it, " would want his money, and clear out."

It also appears, that when Felix received from his father $1,000, with which to buy furniture for his house, Joseph, as Felix said, complained of it.   The business was at first carried on by Joseph and Felix (who were both of age, and both capable of transacting it), under the firm of J. & F. Ratzer.   Though Felix, and his father and mother, allege that the firm of J. & F. Ratzer was composed of the father and Felix, yet the evidence of such an arrangement is very indistinct and unsatisfactory.   Even Felix himself testifies on the subject in such a way as to cast discredit upon his testimony.   He says, when questioned on the subject of the arrangement under which the alleged partnership sub-sisted :   " I made the arrangement with my father to go in partnership with him as an equal partner, I think."   *Q.* " Why do you say, you ' think ' ? "   *A.* " That is the best of my recollection."   *Q.* " You don't know, then, now, whether you went in as an equal partner or not ?"   *A.* " To the best of my recollection, I did."   On the question being repeated, he says :   " To the best of my memory, I did go into the partnership equally with my father."   *Q.* " Is your memory not clear and distinct on that point ?"   *A.* " Yes, sir ;  I think it is."   *Q.* " Why do you say you ' think,' then, again ?"   *A.* " Because, to the best of my recollec-tion, I did go into partnership with him (with my father) at the time I specified ;  in fact, I know I did."   *Q.* " And do you know the terms now ?"   *A.* " To the best of my recol-lection, I was to have one-half of the profits."   He further says that his father was dissatisfied with him when the partnership ended, and was unwilling to continue the arrangement, because of the inequality, inasmuch as his father received, in consideration of his own services and those of the complainants, only one-half of the profits, while Felix received one-half for his services alone.   He further says his father and he had a settlement at the disso-lution of the partnership, and that there was a little over

Ratzer v. Ratzer.

$1,000 due him. He says he went into partnership with his father late in the fall of 1867, and continued in it till late in the spring of 1869.

Now, his father testifies that that partnership began in May, 1868, and continued about one year; that the profits were about $2,500, or $2,600, and that the reason they dissolved the partnership was, that Felix was satisfied with what he gave him when they settled, which, according to the father's statement, was $1,000. It appears, however, that instead of paying that money to Felix, his father deposited it in a savings bank in his own name. Again, he says that the reason of the dissolution was, that Felix "wanted it so; that he said he would work for him like the other boys, and would be satisfied if. he got only what he needed for his family." So, that, according to the testimony of the father, Felix voluntarily abandoned a right to the half of the profits, singularly, and with remarkable self-abnegation, preferring to accept for his services, out of this very profitable business, a mere support for himself and his family, instead of such support and one-half of the profits; for it appears by the testimony of the father, that during the partnership Felix's family was supported by the former. The evidence of the alleged partnership between Felix and his father is by no means satisfactory. That the latter took some part in the business, however, is apparent. Soon after John entered into the business, the firm name of Ratzer Brothers was adopted. It is true, Felix testifies that it was not until 1870 that that name was used, but it appears from John Garry's testimony that they did business under it in 1867 or 1868; and Oscar D. Wickham testifies that he had a contract with the firm in 1868 or 1869, and that, though he has known them since the former year, he never knew them except as the firm of Ratzer Brothers. From the evidence, it is, to say the least of it, quite as probable that in the beginning, when only Joseph and Felix were associated together, the firm name of J. & F. Ratzer was composed of their names, as that it was composed of the names of their

father and Felix. And when John entered into the concern, the firm name would, if the firm was composed of the three brothers, naturally have become Ratzer Brothers. Felix, and his father and mother, all testify that the business was the father's at the time when the latter name was adopted, and that it continued to be his from thence forward. There is proof that business cards, in the name of Ratzer Brothers, were issued by those who conducted the business as late as 1873. The answer states that " the issuing of cards in the name of Ratzer Brothers was the work of the complainant, John, who issued them without authority from his father and Felix, but that they afterwards acquiesced therein, for the reason suggested by him, that there being great competition, the business would have a greater prospect of success if it were supposed to be conducted by a firm of several persons, than if known to be conducted by one person only." The proof, however, is, not that John issued the cards, but that Felix himself got them printed. There can be no doubt that the change of the name under which the business was conducted was deliberately made, with full knowledge thereof on the part of both Felix and his father. It appears that the harness was conspicuously marked with the name of Ratzer Brothers, when the name was adopted, which was in 1867 or 1868, and that afterwards the business was conducted in that name until August, 1874; and also, that in 1873, thousands of cards, bearing that name, and advertising the business of the firm, were distributed.

The testimony of Oscar D. Wickham is not only evidence of the early use of the firm name of Ratzer Brothers, but also that after the formation of that firm, the father had no interest in the business. He says that he and his partner, having a contract with Ratzer Brothers for the delivery of grains by the latter to them, he went to Paterson to see about it—to see who owned the grains—and the father told him that neither one of the boys was there; that he, (the witness) would have to see some of the boys, as they owned the grain business; that after that he saw Felix, at Paterson,

at his father's house; that Felix said that he expected to fulfill the contract which the witness and his partner held, and he did so; that after that he called again on Felix, to see if he could get more grains than the contract called for, and that Felix then introduced him to his brothers, Joseph and John, as partners in the grains trade. He says that he had heard that John Ratzer, senior, was in the grains trade, but the old man denied it; that Felix told him his brothers were partners in the grains trade, and that his father had nothing to do with it, only to sell the grains that they sent him to sell; and he further testifies that the old man told him he must see the boys to get more grains; that they owned the business. In August, 1874, Felix, substantially denying his father's right to participate in the conduct of the business, wrote to John that the bargains made by their father therein were not to be recognized. That the firm of Ratzer Brothers, composed of the complainants and Felix, carried on the business of quarrying, is proved. It is also proved, it may be remarked, that in 1873, the complainant, John Ratzer, junior, entered into a valuable contract, in his own name, for carting, with a corporation in Paterson, and the proceeds thereof, nearly $1,000, went into the business of Ratzer Brothers. Since the rupture, the business has been carried on by Felix, in his own name, though he and his father both say it belongs entirely to the latter, and Felix professes to have no interest in it, except as a manager, and to be entitled to no compensation, except his maintenance, and whatever else his father sees fit to give him. The firm of Ratzer Brothers brought suit for a debt (grains sold in 1872) in New York, and Felix, in November, 1874, swore before the referee, that the firm was composed of himself, and Joseph and John. His father, when called upon, in 1874, to endorse a note which the complainants and Felix had signed, for a partnership debt due from Ratzer Brothers, refused to endorse it.

The complainants, in August, 1874, asked for a settlement, for their share of the property which was the result

of the business of their firm, and their request was denied; their father claiming to be the absolute owner of all the property which he had purchased with the profits of the business of their firm. They and Felix worked together in a successful business for over seven years. It was conducted in his and their names. In the absence of any agreement, it would, under the circumstances, be presumed to have been so conducted for their joint interest, as partners, and they would be held to be entitled to equal shares of the profits. They were liable ·for its debts. The presumption, from the fact that it was carried on by them in their own names, is that it was their business. There. is no evidence that any money of their father's was employed in it. The horses, wagons, &c., used in the business, were their property. They are entitled to relief. There will be a decree that the partnership business done by the complainants and Felix, from the spring of 1867 to the 9th of August, 1874, was the business of the complainants and Felix, and that their father had no interest therein; that the business of buying and selling grains done prior to that time, was done for the joint account of Joseph and Felix and their father; that the teaming business done prior to the commencement of the business of the firm of Ratzer Brothers, was the business of Joseph and Felix, and that their father had no interest therein, and there will be an account accordingly. Mary Ann Ratzer will be decreed to account to the complainants for the money received by her from them respectively. John Ratzer, senior, will be decreed to account to them respectively for, and to hold accordingly in trust for them, their respective shares of the property in his hands, bought with money in which they had an interest, and to account for, and to hold in trust for them, their respective shares of the investments of money in which they had an interest. Felix will be ordered to account for, and to hold in trust for them, their shares of the property in his hands bought with the partnership money. On the other hand, they will be required to account to their father for their

board and lodging, and to account for moneys received by them, from their father and mother, since their majority. In the account, they will respectively be required to account, of course, for any partnership moneys received by them directly.